# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 08-1486


**STATE OF LOUISIANA**

**VERSUS**

**RODNEY  J. TOLLIVER**


**\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 101950
HONORABLE KRISTIAN DENNIS EARLES, DISTRICT JUDGE


**\*\*\*\*\*\*\*\*\*\***


**ELIZABETH A. PICKETT**
**JUDGE**


**\*\*\*\*\*\*\*\*\*\***


Court composed of John D. Saunders, Michael G. Sullivan, and Elizabeth A. Pickett, Judges.


**AFFIRMED.**


**Michael Harson**
**District Attorney, 15th JDC**
**Keith Stutes**
**Assistant District Attorney**
**P.O. Box 3306**
**Lafayette, LA 70502-3306**
**(337) 232-5170**
**Counsel for State-Appellee:**
**State of Louisiana**

**Carey J. Ellis III**
**Louisiana Appellate Project**
**707 Julia St.**
**Rayville, LA 71269**
**(318) 728-2043**
**Counsel for Defendant-Appellant:**
**Rodney  J. Tolliver**

**Rodney J. Tolliver**
**Louisiana State Prison**
**Camp D Eagle 2 Bed 26**
**Angola, LA 70712**
**Pro Se**

**PICKETT, Judge.**

## FACTS

On April 14, 1985, Yolande Landry Theriot was raped and murdered in her home.

On February 19, 2004, the Lafayette Parish Grand Jury indicted the defendant, Rodney J. Tolliver, with one count of first degree murder. Based on the defendant's age at the time of the offense, the state amended the defendant's indictment to charge him with second degree murder, in violation of La.R.S. 14:30.1.

At the conclusion of trial, which commenced on April 17, 2007, and ended on April 24, 2007, the jury found the defendant guilty as charged. On May 7, 2007, the sentencing court imposed the mandatory penalty for second degree murder, life imprisonment.

The defendant now appeals.

## ASSIGNMENTS OF ERROR

1. The trial court failed to follow the proper procedure after his recusal had been requested by written motion.

2. Although Defendant requested continuances on the basis of the unavailability of crucial witnesses in order the [sic] present a defense, those continuances were denied by the trial court.

3. Evidence presented at trial should have been suppressed on the basis that the Defense had no opportunity to examine and test evidence that had been destroyed.

4. There was insufficient evidence for the conviction of second degree murder.

1

**ERRORS PATENT**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find there are no errors patent.

**ASSIGNMENT OF ERROR NO. 4[1]**

The defendant alleges, "There was insufficient evidence for the conviction of second degree murder." The defendant urges there was a lack of eyewitnesses in the case and much of the evidence had been destroyed prior to trial. The defendant asserts the evidence and lack thereof should be reviewed by this court.

> The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. A reviewing court may impinge on the fact finding function of the jury only to the extent necessary to assure the Jackson standard of review. It is not the function of an appellate court to assess credibility or re-weigh the evidence.

*State v. Macon*, 06-481, pp. 7-8 (La. 6/1/07), 957 So. 2d 1280, 1285-96 (citations omitted). "The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La.R.S. 15:438.

---

[1] "When issues are raised on appeal both as to sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence." *State v. Hearold*, 603 So.2d 731, 734 (La.1992).

In 1985, second degree murder was defined as follows:

Second degree murder is the killing of a human being:

(1) When the offender has a specific intent to kill or to inflict great bodily harm; or

(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, aggravated arson, aggravated burglary, aggravated kidnaping, appravated escape, armed robbery, or simple robbery, even though he has no intent to kill or to inflict great bodily harm.

Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.

La.R.S. 14:30.1, as last amended by 1979 La. Acts No. 74, § 1.

Following jury selection, the state began presenting its case by calling Barbara Theriot Obermier to testify. In mid-April 1985, Mrs. Obermier's mother, Yolande Landry Theriot, was been seventy years old. Mrs. Obermier had lived next door to Mrs. Theriot in Lafayette. Mrs. Theriot had lived alone; her husband had died, and her children had all moved away. However, Mrs. Theriot's gardener, Melvin Durall, and his family had lived in a small house on the property.

Mrs. Obermier described Mrs. Theriot as having been "very cautious" and "very conscious" about security. Mrs. Theriot had always made sure her doors were locked, and she had never opened the door if someone came to her house late in the evening. Prior to her death, Mrs. Theriot had all of her jalousie windows sealed with silicone except for the one in the back door.[2]

Mrs. Obermier testified that April 14, 1985, had been a Saturday. The day prior, Mrs. Theriot had attended a friend's funeral. Mrs. Theriot had returned home around

---

[2]Mrs. Obermier described jalousie windows as glass slats located on either side of a plate glass window that open up and are very bad for heating and cooling.

three o'clock that afternoon.  After Mrs. Theriot changed clothing, she and Mrs. Obermier had gathered eggs from Mrs. Obermier's chickens.  Mrs. Obermier had then accompanied her mother back to the Theriot residence.  During the visit, a friend had called Mrs. Theriot and invited her to dinner.  Once Mrs. Theriot agreed to the dinner arrangements, Mrs. Obermier had gone home.

Mrs. Obermier reported that Mrs. Theriot's friends picked her up for dinner around seven o'clock that evening.  That evening, during the ten o'clock news, Mrs. Obermier noticed Mrs. Theriot's porch light had been turned off, so Mrs. Obermier knew Mrs. Theriot had made it home.   Mrs. Obermier related that Mrs. Theriot had turned the porch light on to guide her friends to the house.

Mrs. Obermier stated that she had been making breakfast the next morning when a friend of her mother's had called.  The friend wanted to know if Mrs. Theriot was at the Obermiers' because he had been unable to reach Mrs. Theriot. Mrs. Obermier sent her husband, Frank, next door to see if there was a problem.  When he returned, Mr. Obermier told her that he had knocked and knocked, but Mrs. Theriot had not answered the door.

Mrs. Obermier then returned with her husband to Mrs. Theriot's home.  They had knocked on the back door and had not gotten an answer, so they had walked to Mrs. Theriot's bedroom window and knocked there.  Again, there was no answer.

Mrs. Obermier stated that she and her husband had continued on to the next door and found it was ajar. Mrs. Obermier had realized something was wrong when she saw the door was open. The open door was the one Mrs. Obermier had neglected to seal. The Obermiers found Mrs. Theriot lying on her bedroom floor.  Mrs. Obermier thought Mrs. Theriot might have fainted, but, after feeling for Mrs. Theriot's pulse, Mr.

4

Obermier said, "she's gone." The Obermiers had not touched anything. Mrs. Obermier had immediately gone into the living room where she called 911.

Mrs. Obermier remembered Acadian Ambulance arriving. The emergency medical technicians came outside after examining Mrs. Theriot. They said they had to contact the police because they suspected foul play. The Sheriff's officers arrived shortly thereafter. The officers investigated the scene and interviewed family members. They ultimately arrested Mrs. Obermier's son, Joseph Delhomme. Mr. Delhomme lived with the Obermiers. The matter proceeded to trial, but the proceeding resulted in a mistrial, and the charges were dropped. Mrs. Obermier denied ever knowing the defendant and ever seeing Mr. Delhomme with the defendant.

On cross-examination, Mrs. Obermier recalled that the jalousie on the door had been open. Mrs. Obermier said her mother had been covered with a blanket, and the bedroom had been ransacked. Nothing else in the house seemed to be "much" out of order. There had been jewelry on her mother's dresser. Mrs. Theriot's coin purse, which was usually kept in the closet, was shown in crime scene photographs to have been on Mrs. Theriot's dresser. Mrs. Obermier also reported that a lamp on the bed's headboard had been overturned. Mrs. Obermier stated that the defense's photographs showed Mrs. Theriot to have been garbed in her nightgown under the blanket.

On re-direct, Mrs. Obermier testified that Mrs. Theriot always wore her housecoat when she had visitors in her house, and that the housecoat had been neatly folded on the rocker by Mrs. Theriot's bed.

Lafayette Parish Sheriff's Officer Barry Baldwin was the next witness to testify for the prosecution. On April 14, 1985, Officer Baldwin was a patrolman. He was dispatched to Mrs. Theriot's residence for a possible natural death. The dispatchers

5

from Acadian Ambulance had advised him that their medics were on the scene and had discovered some unnatural circumstances in the death. After speaking with the medics, Officer Baldwin asked them to step outside while they secured the scene. Officer Baldwin then notified the crime scene investigators and the detectives who were on call. The coroner and crime scene investigators eventually arrived and began their duties.

Virginia Castel-Lovell was the state's third witness. On April 14, 1985, Ms. Castel-Lovell had worked as a detective with the crime scene unit at the Lafayette Parish Sheriff's Department. Ms. Castel-Lovell had since moved out of the state, and she no longer worked in law enforcement. As part of her duties, Ms. Castel-Lovell investigated Mrs. Theriot's homicide.

Ms. Castel-Lovell reported that the door had been ajar when she arrived. Ms. Castel-Lovell had photographed the scene before she entered it because people coming into the area might have been bringing things into the scene. When Ms. Castel-Lovell entered Mrs. Theriot's bedroom, she saw Mrs. Theriot lying on the floor, covered with a blanket, with one arm up and one arm down. There were pink rags on the floor near Mrs. Theriot's head.

Ms. Castel-Lovell stated that she had examined the door for marks indicating a forced entry. The panes had been open, and one of the panes had been pushed to the side. Other evidence recovered from the door were some dark drops, a fingerprint, and hair. The bottom corner of the screen had been unscrewed and pushed out so someone could push their hand through. All of the panes in the window had been clean except for one clear latent fingerprint. Ms. Castel-Lovell's investigation had further revealed fingerprints near a light switch to the left of the door.

Ms. Castel-Lovell recalled that the fingerprint on the glass pane had been unusually clear. Ms. Castel-Lovell had been able to get three complete lifts from it. Ms. Castel-Lovell remembered the fingerprint in detail. Her fingerprint training had taught her to identify reference points in the fingerprint, and this fingerprint had a "bull's eye" in the center and a crescent moon shape down below the "bull's eye." Ms. Castel-Lovell had been able to verbally describe the reference points in the fingerprint when an officer contacted her about it in 2003 or 2004. When the officer emailed her a digital picture of the fingerprint, Ms. Castel-Lovell had positively identified it. She stated that she would never forget that print. After Ms. Castel-Lovell identified the print, the officer told her that they had found a match. Ms. Castel-Lovell explained that Mr. Delhomme's fingerprint had not matched the one found on the pane.

Ms. Castel-Lovell recalled that the bed had been in disarray, so it indicated Mrs. Theriot had not gotten up out of her bed to answer the door. Ms. Castel-Lovell explained the towels found near Mrs. Theriot's body had also been notable because they were out of place and in disarray.

Ms. Castel-Lovell's examination of the body had revealed a dried, reddish substance from the corner of the victim's mouth. Although she had thought it was blood she had not made any conclusions until it had been tested. The victim had small bruises in an oval pattern around her mouth suggestive of a possible bite. The tip of the victim's nose had been red, and she had bruising around her eyes. Ms. Castel-Lovell had also collected samples of all substances found on the victim's body, so they could be tested and identified.

Ms. Castel-Lovell attended Mrs. Theriot's autopsy as part of her investigation. During the autopsy, several photographs were taken. State's Exhibit 30 showed the

7

bruising in Mrs. Theriot's mouth area, teeth marks under her lips, and a brown bruise on the right side of her mouth. State's Exhibit 31 depicted Mrs. Theriot's face and showed bruises around her brow and mouth. State's Exhibit 32 showed the front of Mrs. Theriot's torso with blood seepage from her vagina. State's Exhibit 33 showed a dried substance on Mrs. Theriot's stomach. Scrapings had been collected after the photograph.

Ms. Castel-Lovell described State's Exhibits 35 and 36 as showing bruising around both nipples with a crusting of blood on one. State's Exhibit 37 was a photograph of the inside of Mrs. Theriot's mouth. She had not been wearing her dentures, and there had been an abrasion under her tongue that had caused blood to leak from her mouth. State's Exhibit 38 showed a close-up of Mrs. Theriot's vagina, which bore abrasions inside; the abrasions had bled.

Ms. Castel-Lovell testified that she had collected the following physical evidence at the autopsy: oral and vaginal swabs, head and pubic hair, nail clippings and scrapings, fluids, and scrapings of any unusual substances found on the body. After the evidence was sealed, it was sent to a lab for analysis. The pink towels from the crime scene had also been also sent to the lab.

Ms. Castel-Lovell stated that there had been an arrest in the case and a trial in 1988. Ms. Castel-Lovell relayed that they had been unsuccessful in matching the fingerprint or coming up with any plausible possible suspects in the case, and the family had become anxious. The Sheriff's Office began pushing for a suspect, and Mr. Delhomme's behavior had been suspicious because he had always seemed to be at the crime scene, he had always been asking questions, and he had always been very eager to volunteer information. None of the physical evidence matched, but Mr. Delhomme

could not relate a clear story of why he could not have been a participant in the crime. Mr. Delhomme's fingerprints were found in Mrs. Theriot's home, but they were not considered evidence of his guilt because he had been a frequent visitor there. Other family members had mentioned Mr. Delhomme's involvement in drug activity. Ultimately, the pressure to make an arrest had resulted in Mr. Delhomme's being arrested on circumstantial evidence.

Ms. Castel-Lovell reported that the evidence in the case was supposed to be kept either in the evidence lockers or by the crime lab. Some of the evidence had been given to Mr. Delhomme's defense attorney, Mr. Simon, for independent testing and analysis. Both the glass pane from the jalousie door and the towels had been admitted into evidence at Mr. Delhomme's trial.

On cross-examination, Ms. Castel-Lovell revealed that Mr. Delhomme had led her to one of the pieces of evidence she collected: a rag on top of a stick located down the driveway near the highway. That rag was not considered a top priority because it had been contaminated both by its environment and because Mr. Delhomme had touched it. Mr. Delhomme's friend Carl Levine had also participated in finding the rag and showing it to Ms. Castel-Lovell. The rag and a hair found with the rag had been sent to crime lab for analysis and processing.

John Jacobson, who was the deputy coroner and chief investigator for the forensic lab in 1985, was the next witness to testify. Mr. Jacobson had participated in the autopsy. Mr. Jacobson had been the person who made the declaration of death for Mrs. Theriot. Mr. Jacobson had observed the lacerations to Mrs. Theriot's mouth and vagina. Although he had not been the one who prepared the slides in the case, Mr. Jacobson had also observed what he assumed to be semen in Mrs. Theriot's mouth.

9

Dr. Cameron Snider, an associate medical examiner, testified as the next witness for the state. The parties stipulated to Dr. Snider's expertise in forensic pathology. Dr. Snider spent two years as the regional forensic pathologist at the Lafayette Parish Coroner and Forensic Center. As part of his duties, Dr. Snider reviewed reports and evidence in cold cases. As a result, he assisted in reopening the investigation of Mrs. Theriot's death. Dr. Snider reviewed both the 1985 autopsy report and the photographs taken in the case. Dr. Snider agreed with the conclusions of the pathologist who performed the report in 1985.

Dr. Snider explained that his conclusion as to Mrs. Theriot's cause of death matched that of the examiner, asphyxia. The pattern of injuries to the body indicated the asphyxia had been caused by the placing of a soft object, such as a pillow, over the nose and the mouth of Mrs. Theriot.

Dr. Snider testified that, typically, a person being suffocated by a pillow would lose consciousness after three to five minutes. If the pillow were lifted quickly enough after that, then the person might be able to regain enough consciousness to draw breath. However, the longer the pillow was held down, the narrower the chances of survival.

Dr. Snider stated that his findings included blunt-force injuries caused by a pattern of struggle or restraint, injuries indicative of asphyxiation, and injuries evidencing forced sex. The injury patterns showed that Mrs. Theriot had been restrained by her arms while she had been on her back. The pattern had been consistent with someone being on top of her body. The asphyxia injuries had been consistent with someone smothering Mrs. Theriot with a pillow while she laid on her back. The injuries to her breasts and nipple area, within her mouth, and within the

10

female private area had been consistent with forced sexual activity or penetration to the point of injury.

Dr. Snider related that the injuries to the breasts show scrapes from the perpetrator's incisors and bruises from pressure sufficient to crush the tissue. The large, gaping laceration from the entrance of the vagina extending upward on the back wall of the vagina was caused by penetration and constituted a significant injury. Dried blood was present on the mons pubis area and adjacent thighs. The bleeding indicated the victim had been alive when the injury was inflicted.

Dr. Snider described the injury to the inner mouth as a gaping laceration under the tongue with a hemorrhage from the angles of the mouth. The presence of spermatozoa in the mouth and the vaginal area indicated the injuries had been caused during forced sexual activity. It took a significant degree of force to tear the tissue between the bottom of the tongue and the mouth. The injury could have been caused by a finger, but the presence of spermatozoa indicated it may have been caused by a rigid human penis. The injuries to the mouth had also been caused prior to Mrs. Theriot's death. In Dr. Snider's opinion, it was not possible that the semen was present before the injuries were inflicted.

Detective Kristen Bayard, who worked for the Lafayette Police Department as a crime scene investigator, was the next witness to testify for the prosecution. Detective Bayard's duties included detecting latent and patent fingerprints and handprints. Detective Bayard's duties also involved identification and comparison of fingerprints and handprints. The state offered and the court accepted Detective Bayard as an expert in fingerprint identification and comparison.

11

In June 2003, Detective Bayard had been having a slow work day, so she had started pulling the fingerprints from old case files. Detective Bayard had wanted to run the fingerprints through the Automated Fingerprint Identification System (AFIS) system. Detective Bayard pulled the fingerprint in evidence from the Theriot file and examined it before determining it had sufficient detail for the AFIS system. The AFIS system yielded a positive identification by returning a number indicating the fingerprint belonged to the defendant. After getting a second opinion from her sergeant, Detective Bayard contacted the Sheriff's Office to inform them of the fingerprint match.

Detective Bayard remembered that she had contacted Ms. Castel-Lovell because she had been the original crime scene technician in the case from which the fingerprint had been obtained. When Detective Bayard asked Ms. Castel-Lovell if she recalled any latent prints she had collected and from where they had been collected, Ms. Castel-Lovell responded that she distinctly remembered one particular fingerprint and that she would be able to identify it if she saw it again. Detective Bayard then digitally photographed the fingerprint and emailed Ms. Castel-Lovell a copy thereof. Ms. Castel-Lovell indicated the print was the one she remembered.

Detective Bayard stated that she provided this information to the detective from the Sheriff's Office who had been assigned to reopen the case. At some point, the defendant was identified and located by the Sheriff's Office. The defendant was then fingerprinted, and examination of the defendant's fingerprints yielded a match to the defendant's left thumb. There were twenty-nine points of identification between the fingerprints. Lafayette accepts no fewer than ten points of identification. Detective Bayard opined that the fingerprint recovered during the murder investigation belonged to the defendant.

12

Detective Bayard further examined the case file and determined that there was some evidence still with the file. She sent that evidence to the Acadiana Crime Lab. Detective Bayard attempted to locate the evidence introduced during Mr. Delhomme's trial. She was able to find some of the evidence. Part of the evidence recovered was a pink towel. Detective Bayard requested DNA analysis by the crime lab. The stains from the hand towel were delivered to the Acadiana Crime Lab in July 2003.

Lieutenant Frank Durand, who was an evidence manager with the Lafayette Parish Sheriff's Office, testified regarding the chain of custody for the evidence. Lieutenant Durand had not been the evidence custodian during the original investigation. After commencing employment, Lieutenant Durand maintained the records that already existed. When a request for scientific analysis was submitted, the requested item would have been sent to the crime lab. Once the analysis was complete, the lab would have returned the evidence.

In 1988, some evidence in the case had been removed from Lieutenant Durand's custody for trial. Lieutenant Durand testified that some of the evidence had subsequently been destroyed, but some had been returned. At some point, Lieutenant Durand released all of the evidence to the detective newly assigned to the case.

Howard Joseph Verret, Jr., who worked as a forensic chemist for fifteen years, was the next witness called by the State. In 1985, Mr. Verret was employed by the Acadiana Criminalistics Laboratory. Over the defense's objection, the trial court accepted Mr. Verret as an expert in the field of serology. During his employment with the Acadiana Criminalistics Laboratory, Mr. Verret examined evidence in the case involving Mrs. Theriot's death. Mr. Verret issued a report on his findings. Mr. Verret reported that he discovered spermatozoa on the oral slide taken from the victim. Mr.

13

Verret also found blood and semen on a towel. Upon his finding blood or semen, the stains were cut out of the towel and frozen in an effort to preserve the genetic material. Mr. Verret, whose testimony encompassed the chain of custody for the items submitted to the crime lab, related that some of the samples had been released at the request of Mr. Delhomme's attorney for independent analysis.

The prosecution's next witness, Starr Barbaro, also worked for the Acadiana Criminalistics Laboratory in 1985. At that time, Ms. Barbaro was the only technician in the serology department. She worked with the chemist, Mr. Verret. Ms. Barbaro also testified as to the chain of custody for the items sent to the crime lab. Ms. Barbaro confirmed the presence of semen on the hand towel.

Edward Blake then testified for the state as an expert in forensic serology, forensic DNA extraction, and forensic DNA analysis. In 1986, DNA technology was in its infancy. During that year, Dr. Blake consulted with J. Minos Simon, who, at the time, had been representing Mr. Delhomme. Dr. Blake received and examined evidence sent to him by Mr. Verret.

Dr. Blake saw that the oral slides contained a large quantity of spermatozoa and epithelial cells. Based on this information, Dr. Blake concluded that, given the large concentration of spermatozoa present, there had been an act of oral copulation with Mrs. Theriot shortly before her death. If she had survived for a length of time thereafter, the production of saliva and resultant swallowing several times every few minutes would have flushed the mouth. The vaginal slides contained no spermatozoa. The stains on both the pillowcase and the towel contained semen and saliva.

Dr. Blake's analysis agreed with Mr. Verret's. Mr. Delhomme could not be excluded as a semen donor. Both opinions had been based on blood typing rather than

14

DNA analysis. The markers present in the semen at the time were present in one out of every eight individuals. Dr. Blake retained and archived the slides prepared by Mr. Verret, but he returned the remaining evidence to Mr. Simon.

Dr. Blake remembered that, in 2004, he had been asked to locate the slides and determine whether the material on the slides could be used to perform a DNA analysis. Dr. Blake located the slides and determined them to be in the same condition as when he initially examined them. Dr. Blake and his colleague Allen Keale then analyzed the DNA on the oral slide and the slide made from the pillow case. Before removing the material from the slides, they photographed them and made photomicrographs of the cellular material. After extracting and profiling the DNA, Dr. Blake prepared a report of his findings. On cross-examination, Dr. Blake reported his work returned a profile for a female, presumed to be Mrs. Theriot, and one profile for an unknown male.

Detective Kevin Stelly with the Lafayette Parish Sheriff's Office was the next witness. He testified about the chain of custody for the DNA evidence seized from the defendant after the case was reopened in 2003.

Carolyn Booker, a DNA analyst with the Acadiana Crime Lab, also testified. Ms. Booker was accepted as an expert in forensic chemistry, specifically forensic DNA analysis. Ms. Booker became involved in the investigation of Mrs. Theriot's murder in the summer of 2003. The Sheriff's Office provided Ms. Booker with evidence from the case for analysis; a semen stain from a hand towel proved useful.

Ms. Booker explained that her lab looks at fifteen different DNA markers plus the gender marker. Ms. Booker analyzed the DNA on the towel as well as reference samples from Mrs. Theriot and Mr. Delhomme. Upon comparison, Ms. Booker discovered neither Mrs. Theriot's nor Mr. Delhomme's DNA matched the DNA found

15

on the towel. Ms. Booker issued a report on her findings in 2003. Shortly after writing her report, the Sheriff's Office submitted the defendant's DNA for analysis in the case. Ms. Booker then analyzed the defendant's DNA and compared it to the DNA from the towel. The DNA profiles matched.

Ms. Booker recalled that she received a report from Dr. Blake. After reading the report, Ms. Booker understood that Dr. Blake had analyzed the DNA from sperm found on the oral slide made from the victim in 1985 and had discovered two DNA profiles. Dr. Blake's report did not refer to the defendant in any way.

Ms. Booker stated that she compared the profiles generated by Dr. Blake to the DNA profiles she had generated from the defendant, from Mrs. Theriot, and also from the towel. Ms. Booker determined that the DNA profile generated by Dr. Blake from the skin cells matched Mrs. Theriot. The DNA profile Dr. Blake had generated from the sperm cells matched both the defendant's DNA and the DNA found on the towel. The profiles were exactly the same.

Melvin Durall was the next witness for the prosecution. Mr. Durall worked for Mrs. Theriot and called her, "Mom Theriot." In 1985, Mr. Durall lived in a little house behind Mrs. Theriot's home. Mrs. Theriot babysat for Mr. Durall when he had to leave home. Mr. Durall also knew Mrs. Theriot's children and grandchildren. He got along well with all of them.

Mr. Durall recalled the day Mrs. Theriot had been found dead. The day before that, Mr. Durall had attended his sister-in-law's wedding. The defendant, who is Mr. Durall's nephew, also attended the wedding. In April 1985, the defendant had been sixteen years old. Mr. Durall attended the wedding reception, but he did not see the defendant there. The reception began at 9:00 p.m., and Mr. Durall and his wife left

16

around 1:00 a.m. Mr. Durall did not see anything out of the ordinary when he returned home. He went to bed around 1:30 a.m. and woke up around 8:30 a.m.

Mr. Durall remembered that he had rented a car, so he returned the rental vehicle the morning Mrs. Theriot's body was found. When he arrived home, law enforcement was present, and Mr. Durall learned that Mrs. Theriot was dead. Mr. Durall never saw the defendant near or in Mrs. Theriot's house. The only time Mr. Durall had seen the defendant near the premises was when the Duralls had a barbeque, but he never stayed long. Mr. Durall stated that he had never seen the defendant visit Mr. Delhomme.

Following Mr. Durall's testimony, the state rested. The defense recalled Mr. Verret and Mr. Durall to testify as its first two witnesses. Their testimonies elaborated on their initial statements.

The defense's third witness was Frank Obermier. Mr. Obermier did not recall ever seeing the defendant around either the Theriot or Durall houses. Mr. Obermier stated that Mrs. Theriot had not been very security conscious, but that she would not have let a stranger into her home. Mrs. Theriot kept the chain on her door fastened. Mr. Obermier did not see anyone walk by that night. Mr. and Mrs. Obermier found Mrs. Theriot's body. Neither of them covered her. The Obermiers found the door standing open about six inches. Mr. Obermier stated that Mrs. Theriot's porch light had been on when he went to bed around 10:00 p.m., but she usually left it off. Mr. Obermier confirmed that he had been considered a suspect in Mrs. Theriot's death.

The defense next called Mr. Delhomme to testify. Mr. Delhomme lived next door to Mrs. Theriot, and he visited almost daily. Mr. Delhomme acknowledged being acquainted with the defendant. Mr. Delhomme would see the defendant when he was visiting the Duralls. Mr. Delhomme stated that he and his girlfriend had planned to go

17

to the movies on the afternoon prior to Mrs. Theriot's body being found, but they did not make it because his girlfriend had been running late. Instead, they went to a party out of town, and they arrived home between 11:30 p.m. and midnight. Once at his house, his girlfriend stayed with him until leaving around 3:00 a.m. Mr. Delhomme did not enter Mrs. Theriot's house that day.

Mr. Delhomme recalled that he had been sleeping when his sister ran into his room saying that someone had killed, "Mom." Mr. Delhomme thought he was dreaming, so he went back to sleep. Later, Mr. Delhomme's brother-in-law woke him up again. By the time Mr. Delhomme reached Mrs. Theriot's home, the police had placed a tape barrier around the house. Mr. Delhomme denied having anything to do with Mrs. Theriot's death.

Mr. Delhomme reported that a friend of his found a towel wrapped around the end of a branch. The friend had been walking through the woods to meet Mr. Delhomme, who, at his mother's request, had been searching for his grandmother's wallet. Mr. Delhomme got along very well with his grandmother, and he offered to assist in the investigation in any way he could. Mr. Delhomme offered to take a lie detector test because they were questioning him constantly. He had been concerned that the murderer would get away because law enforcement was focused on him.

The defense's fifth witness was Larry Tolliver, the defendant's uncle.[3] Mr. Larry Tolliver was aware that Mrs. Theriot was murdered in 1985. Mr. Larry Tolliver also knew Mr. Delhomme from his visits to the Durall's house. As children, Mr. Larry

---

[3]The defense called several relatives to testify on the defendant's behalf. The defense did not ask any of those relatives, who presumably would have all been present at the wedding and reception, whether the defendant had been present at the reception. This is notable because the defense attempted to impeach Mr. Durall's testimony by asking if he had ever said he had seen the defendant at the wedding reception, thereby implying that the defendant had an alibi because the defendant had been in the presence of family at the time he was supposed to be committing this crime.

18

Tolliver and Mr. Delhomme played together. As adults, they would encounter each other in clubs. Mr. Larry Tolliver stated that, on one occasion, Mr. Delhomme, accompanied by the defendant, asked him if he wanted to buy a man's diamond ring. On cross-examination, Mr. Larry Tolliver clarified that the incident with the ring had happened after Mrs. Theriot's murder.

Charles Tolliver, also the defendant's uncle, testified as the sixth witness for the defense. Mr. Charles Tolliver was not directly involved with the Theriot family in the 1980s, but he went onto the Theriot property when he visited the Durall's home. Mr. Charles Tolliver stated that he had seen Mr. Delhomme once or twice. Mr. Charles Tolliver denied ever seeing the defendant on the Theriot property and ever seeing the defendant in the company of Mr. Delhomme.

The defense recalled Lieutenant Durand to testify as its seventh witness. Lieutenant Durand stated that he could not verify that the evidence had been placed in the correct envelopes each time it had been repackaged and photographed.

The defense's final witness was Joan Durall. Mrs. Durall lived on the Theriot property with her husband and children. The defendant would come onto the property when the Duralls hosted a social gathering. Mrs. Durall stated that Mr. Delhomme did not go onto the property much. She thought he and his grandmother had problems. She overheard him call his grandmother a bitch. From Mrs. Durall's observations, Mr. Delhomme's relationship with his grandmother was sometimes smooth and sometimes not.

On cross-examination, Mrs. Durall explained that she had a close relationship with Mrs. Theriot, she had loved her very much, and that she had grieved her death. Mrs. Theriot included the Duralls in her family Christmas celebrations, and Mrs. Durall

19

went into the Theriot residence fairly often. The defendant was never invited to or present at the Theriot family gatherings that included the Duralls.

The evidence presented at trial shows the defendant broke into Mrs. Theriot's home and raped her. Mrs. Theriot was then, based on the presence of semen and concentration of the defendant's spermatozoa in her mouth, smothered within minutes after the defendant completed the rape. In order to smother her, the perpetrator had to hold the pillow over her face from four to seven minutes. Nothing was reported missing from the home.

In *State v. Morris*, 99-3075 (La.App. 1 Cir. 11/3/00), 770 So.2d 908, *writ denied*, 00-3293 (La. 10/12/01), 799 So.2d 496, *cert. denied*, 535 U.S. 934, 122 S.Ct. 1311 (2002), the defendant, along with two accomplices, robbed a supermarket while using a gun to facilitate the offense. The police arrived on the scene while the robbery was in progress, and the defendant's accomplices left him; they drove away, and the police quickly caught them. The defendant escaped by kidnaping an arriving store employee from the parking lot, taking both her and her car. Someone found the employee's body one hour later; she had been shot. The police arrested the defendant five hours later when he attempted to recover a second vehicle used by the conspirators, and law enforcement recovered the victim's car the next day.[4] The first circuit determined there was sufficient evidence to support the defendant's second degree murder conviction: "it is reasonable to assume that the victim was murdered by the person who kidnaped her. The jurors could rationally infer that by shooting the victim point-blank in the

---

[4]The defendant had abandoned the victim's car several hours after the robbery. An unconnected second party then stole the car and turned it over to a third party, who burned the vehicle.

20

chest with a large caliber weapon the defendant acted with the specific intent to kill her." *Id.* at 926.

As in *Morris*, the evidence in the instant case shows the defendant committed a violent offense against Mrs. Theriot immediately before her death, so it was reasonable for the jurors to find the defendant was the person who committed the murder. Thus, there was sufficient evidence presented at trial to prove, beyond a reasonable doubt, that the defendant was guilty of the second degree murder of Yolande Theriot. Accordingly, this assignment of error is without merit.

### ASSIGNMENT OF ERROR NO. 1

The defendant argues, "The Trial Court failed to follow the proper procedure after his recusal had been requested by written motion." The defendant bases this argument on the trial court's deciding the merits of the motion without referring it to another judge for consideration.

The state responds that the grounds stated in the motion to recuse filed by the defense did not constitute legal grounds for recusation, as they were unsubstantiated and constituted mere conclusory allegations. The prosecution further replies that the motion to recuse was untimely, as it was based on an act that occurred eight months before the defense filed the motion.

At the end of the last pretrial hearing, which was on April 16, 2007, the defendant filed a "Motion to Recuse" together with an "Amended Motion to Recuse." In the motion to recuse, the defendant alleged Judge Kristian Earles, the trial judge, should be recused because he witnessed the defendant spit on his third attorney, which action led to that lawyer's withdrawal from the case. The defendant contended that Judge Earles's having witnessed this would prevent him from conducting a fair and

21

impartial trial. The amended motion to recuse added that Judge Earles's subsequent decision to handle the defendant in a special manner, particularly while in court, showed Judge Earles was convinced the defendant was dangerous, cunning, and manipulative. The defendant urged this was further evidenced by Judge Earles making it known to defense counsel that the defendant had probably been trying to delay his case when he spit on his counsel. The defendant urged Judge Earles was, therefore, biased against the defendant.

At the hearing, the defense contended that the recusal decision should be referred to another judge for resolution. After listening to arguments presented by both the defense and the prosecution, Judge Earles denied the motions to recuse:

> THE COURT: I heard your argument. And Article 674 does deal strictly with that, and it says, "If a valid ground for recusal is set forth in the motion." I don't believe a valid ground has been set forth in the motion because I simply stated to you in chambers so that you would not -- yourself be used by Mr. Tolliver for another continuance. You understand? And you know in what context that was given to you. I did that for your own personal benefit so that you wouldn't have a problem with Mr. Tolliver, and get fired by Mr. Tolliver, and not have the trial. That is why I told you what I told you. Okay? And you and I both know that. Mr. Stutes knows that. Mr. Tolliver admitted to that in court. That has nothing to do with the trial on the merits. There was no opinion expressed by me about his guilt or innocence on this particular charge. And you have to state valid grounds for a motion to recuse, and I'm denying the motion to recuse.

"A trial judge is presumed to be impartial," and the burden is on the party seeking the recusal to allege and prove grounds of a substantial nature and not mere conclusory allegations. *State v. Mayeux*, 06-944, p.22 (La.App. 3 Cir. 1/10/07), 949 So.2d 520, 534.

> A. In a criminal case a judge of any court, trial or appellate, shall be recused when he:

(1) Is biased, prejudiced, or personally interested in the cause to such an extent that he would be unable to conduct a fair and impartial trial;

(2) Is the spouse of the accused, of the party injured, of an attorney employed in the cause, or of the district attorney; or is related to the accused or the party injured, or to the spouse of the accused or party injured, within the fourth degree; or is related to an attorney employed in the cause or to the district attorney, or to the spouse of either, within the second degree;

(3) Has been employed or consulted as an attorney in the cause, or has been associated with an attorney during the latter's employment in the cause;

(4) Is a witness in the cause;

(5) Has performed a judicial act in the case in another court; or

(6) Would be unable, for any other reason, to conduct a fair and impartial trial.

B. In any cause in which the state, or a political subdivision thereof, or a religious body is interested, the fact that the judge is a citizen of the state or a resident of the political subdivision, or pays taxes thereto, or is a member of the religious body is not of itself a ground for recusation. La.Code Crim.P. art. 671. "A judge has full power and authority to act, even though a ground for recusation exists, until he is recused, or a motion for his recusation is filed." La.Code Crim.P. art. 673.

"If a valid ground for recusation is set forth in the motion [to recuse], the judge shall either recuse himself, or refer the motion for hearing to another judge or to a judge ad hoc, as provided in Article 675." La.Code Crim.P. art. 674. However, if the motion does not allege a valid ground for recusal, the trial judge may deny the motion without referring the matter to another judge for resolution. *State v. Lukefahr*, 363 So.2d 661 (La.1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790 (1979).

23

On appeal, the defendant does not challenge the denial of the motion to recuse; he challenges the propriety of the trial court's refusal to refer the motion to another judge. Both in the motion and at the hearing, the defense failed to allege any specific instances where the defendant had been treated unfairly on the record by Judge Earles. From the argument presented and the ruling by the trial court, it appears, when the defendant's trial counsel was appointed, Judge Earles discussed the defendant's attitude and behavior toward his previous attorneys with counsel for both sides. The defense never alleged that the statements made by Judge Earles during that discussion were untrue or undeserved. Thus, because the motion to recuse failed to set forth a substantial claim based on more than conclusory allegations, the trial court did not abuse its discretion in denying the motion without first referring the matter to another judge.

The defendant newly asserts on appeal that the trial court's bias against the defendant is shown by Judge Earles' ruling on August 21, 2006, which found the defendant to be in direct contempt of court for offensive language and sentenced him to six months in jail to be served consecutively to all other penalties. We note the defendant did not make this allegation in the motion to recuse, in the amended motion to recuse, or when verbally moving for the recusal; therefore, it is beyond this court's scope of review. Uniform Rules—Courts of Appeal, Rule 1-3. Moreover, the defense neither alleges nor argues the finding of direct contempt was undeserved or Judge Earles was acting beyond his authority in so ruling.

Accordingly, this assignment of error is without merit.

24

# ASSIGNMENT OF ERROR NO. 2

The defendant asserts, "Although Defendant requested continuances on the basis of the unavailability of crucial witnesses in order . . . [to] present a defense, those continuances were denied by the Trial Court." The defendant claims the denial of the requested continuances constituted an abuse of discretion because the rulings denied the defendant a reasonable opportunity to obtain necessary witnesses for his defense.

The state responds that the trial court did not abuse its discretion in denying the continuances, as it had already granted the defense continuances of trial for a full year. The trial had been scheduled and continued at the defendant's request four times from January 2006 through December 2006.

## CONTINUANCE FOR AVAILABILITY OF DR. ACTON

The prosecution urges that the defendant's assignment of error, insofar as it pertains to the continuance requested upon the unavailability of Dr. Ronald T. Acton, is without merit because the defendant failed to call Dr. Acton as a witness and failed to preserve Dr. Acton's testimony for review.

The day before trial began, April 17, 2007, the defense filed a motion to continue on the basis that its DNA expert, Dr. Acton, was unavailable. The defense alleged Dr. Acton's testimony was critical to its theory of the case. Defense counsel asserted that he had begun working on the defendant's case in early December 2006 and, due to the destruction of evidence, he was having to find creative ways to find exculpatory evidence. The defense explained it had attempted to set up a meeting to discuss the continuance during the prior week, but a series of events had prevented conference.

The prosecution responded that it had been in contact with the defense all of the prior week except Friday, when the prosecutor had a prior commitment. The

25

prosecutor alleged that he had spent the bulk of the afternoon on Thursday, April 12, 2007, reviewing evidence in the company of defense counsel. The prosecutor had then informed defense counsel of his other commitments that would keep him out of the office Thursday evening and Friday. The prosecution informed the court that the defense had not mentioned the need to argue a motion for continuance until the state received a faxed letter after four o'clock Thursday afternoon demanding a hearing.

The state further related that the defense had sought a continuance on December 4, 2006, based on the unavailability of Dr. Acton. The state alleged the stated need for continuance had been that Dr. Acton would have been unavailable to testify on April 16 and 18, 2007, which was the day prior to the continuance hearing and the first day of trial, so the need for continuance had become moot as trial had not commenced the day before and as the state would be presenting its case the next day.

The state inquired whether Dr. Acton would be available at the end of the week. The defense replied that Dr. Acton had a trial Monday and Tuesday and potentially had a trial Wednesday and Thursday. Defense counsel explained that he was still preparing for trial, he wanted to employ a population geneticist on short notice, and Dr. Acton was the only one available.

The trial court denied the continuance and additionally indicated that it would not grant any other continuances or stays if requested.

Examination of the record shows that the defense presented evidence on Monday and Tuesday of the following week, which was beyond those days the defense alleged Dr. Acton to be unavailable. Additionally, as correctly pointed out by the state, the defense neither called Dr. Acton as a witness nor proffered the substance of his testimony into the record.

26

CONTINUANCE FOR AVAILABILITY OF MS. CASTEL-LOVELL

The state also asserts that the trial court did not abuse its discretion in denying the defendant's April 23, 2007, motion to continue or recess the trial. The state urges that this motion came a week into the trial and was based on the unavailability of two witnesses: Ms. Castel-Lovell, who was the initial investigator in the case, and FBI Profiler Patricia Kirby. The state points out that, before the motion, Ms. Castel-Lovell had already testified extensively as a witness in the case and had been thoroughly cross-examined by the defense.

The state that urges the defense did not indicate it intended to recall Ms. Castel-Lovell at the conclusion of her examination by the defendant when she asked, "Do I leave now?" The state further alleges that Ms. Castel-Lovell remained available for several days following her testimony and spoke to defense counsel during that time, and defense counsel did not notify the court of his intention to further examine Ms. Castel-Lovell until after she left. The prosecution asserts that, contrary to the defendant's allegation, there is nothing on the record showing defense counsel informed Ms. Castel-Lovell she was still under subpoena. The state alleges the trial court contacted Ms. Castel-Lovell regarding her departure, and she told the court that she had left because no one told her she could not leave.

The state contends Ms. Castel-Lovell's testimony is not at issue because the defendant failed to proffer or indicate what testimony he sought to obtain from Ms. Castel-Lovell. Thus, under these circumstances, the prosecution maintains the trial court did not abuse its discretion in denying the continuance requested for the purpose of obtaining additional testimony from Ms. Castel-Lovell.

27

The record shows that, at the conclusion of Ms. Castel-Lovell's testimony, the court told Ms. Castel-Lovell that she could step down. Ms. Castel-Lovell asked if she should leave, and the trial court responded affirmatively. There was no further discussion about Ms. Castel-Lovell on the record at that time.

When trial resumed on the morning of Friday, April 20, 2007, defense counsel informed the court that he was planning to call witnesses who would not be available until the following week. The trial court responded it was defense counsel's problem as witnesses were called one after the other and as the defense would be required to call witnesses when the prosecution rested.

Later in the day, defense counsel notified the trial court that it had wanted Ms. Castel-Lovell held under its subpoena, but it believed Ms. Castel-Lovell had been released. The state responded it had released her. Both defense counsel and the trial court responded Ms. Castel-Lovell had not been released. The defense stated that Ms. Castel-Lovell was gone. It could not locate her. The court stated that she would be there because she was still under subpoena.

On the morning of Monday, April 23, 2007, defense counsel announced Ms. Castel-Lovell had returned to New York, and the defense was attempting to contact her. The state responded that it had her phone numbers, and that she was reachable, but she had returned on her scheduled flight, which had been booked for the previous Thursday. Some discussion ensued regarding whether Ms. Castel-Lovell had been released from her subpoena. The state gave the defense Ms. Castel-Lovell's contact information so defense counsel could contact her.

The court told defense counsel it had previously informed him there would be no more continuances, and defense counsel was responsible for having his witnesses

28

available. The defense stated both that it had not been aware Ms. Castel-Lovell lived in New York and that it had informed her she was going to be called back. Both the trial court and the prosecution stated on the record that they did not recall the defense telling Ms. Castel-Lovell it was going to call her as a witness for the defense. Defense counsel asserted that the trial court had asked whether it was going to release Ms. Castel-Lovell, and he had responded, "No, I'm going to call her back." The court stated that it was fine if that was the case.

After the state rested its case on the afternoon of April 23, 2007, the defense called Ms. Castel-Lovell as a witness before adjourning into a sidebar conference. When the prosecution declared Ms. Castel-Lovell was still in New York, defense counsel stated he had been "making a record." When asked by the court, the defense stated that it had been in contact with Ms. Castel-Lovell. The trial court informed defense counsel taht he could call his assistant to make a note of evidence regarding Ms. Castel-Lovell's whereabouts. The defense indicated that, based on the evidence to be given by the assistant, it would move for a mistrial.

After the jury exited the courtroom, the parties further discussed the availability of Ms. Castel-Lovell. Defense counsel explained that his witness list was problematic because some of his witnesses were adverse witnesses. Defense counsel further alleged that he had informed Ms. Castel-Lovell before she left that he needed her to stay. Defense counsel also alleged, when asked, that he had informed the court that Ms. Castel-Lovell was not released, as she was necessary for the defense's case-in-chief. Defense counsel argued that his office had been unable to contact Ms. Castel-Lovell during the morning and had subsequently obtained a response that prejudiced the defense. Defense counsel contended that Ms. Castel-Lovell's absence prevented him

29

from calling her first, which derailed its defense strategy, the order of the witnesses, and the introduction of several key exhibits.

Defense counsel called his paralegal to testify regarding her contact with Ms. Castel-Lovell. The paralegal stated that she had contacted Ms. Castel-Lovell by calling a New York telephone number, and Ms. Castel-Lovell had indicated that she was in New York and had no plans to return to Louisiana. The paralegal further testified that Ms. Castel-Lovell said the district attorney's office had released her, and Ms. Castel-Lovell would have to check with the district attorney's office if other arrangements needed to be made, as she had been working with the prosecution. On cross-examination, the paralegal stated that Ms. Castel-Lovell had not told her the trial court had released her. The paralegal reported that she had not asked Ms. Castel-Lovell whether either defense counsel or the trial court had instructed her to stay.

Based on his paralegal's testimony, defense counsel moved for a mistrial. The prosecutor countered that he had spoken to Ms. Castel-Lovell around noon, and that she had informed him she left because no one told her she could not leave. The state additionally alleged that Ms. Castel-Lovell specifically declared defense counsel had, at no time, told her either that she could not leave or that she was still under subpoena. The prosecutor expounded that he had never heard the trial court place Ms. Castel-Lovell under defense subpoena and that he had not instructed her to leave in violation of any subpoena. Defense counsel responded that he believed Ms. Castel-Lovell had been placed under defense subpoena prior to trial.[5]

The prosecutor stated that he believed the court should speak with Ms. Castel-Lovell. The state explained that Ms. Castel-Lovell had informed the state that the court

---

[5]The clerk of court confirmed that Ms. Castel-Lovell had been subpoenaed by both the prosecution and the defense.

had asked Ms. Castel-Lovell when she was returning home and had wished her a nice trip. The prosecution reiterated that Ms. Castel-Lovell had waited at the court all day Thursday for someone to tell her whether she was needed, and she had left when no one told her she could not go home.

The trial court stated that it would recess to speak with Ms. Castel-Lovell. The trial court indicated the record should reflect that Ms. Castel-Lovell had been the most lengthy witness with the defense cross-examining her for over two hours. When the trial court asked whether defense counsel had discussed arrangements with Ms. Castel-Lovell for her stay in Louisiana over the weekend, defense counsel stated that he had not. The trial court explained that, once Ms. Castel-Lovell's obligation to the state had been fulfilled, she had probably been awaiting some instruction from the defense. Defense counsel again denied giving Ms. Castel-Lovell any such instruction.

Defense counsel confirmed that he had expected the trial to last beyond the previous Friday. However, defense counsel further alleged that he was not aware when Ms. Castel-Lovell left; she "just disappeared." Defense counsel again stated that he had informed the court, while Ms. Castel-Lovell was still in the witness box, that she was not released from subpoena. Defense counsel stated that he had expected Ms. Castel-Lovell to be present on Friday so he could speak with her about whether she needed anything.

The trial court informed the defense that it had not been aware of whom the defense was calling as a witness, so it had not interfered by making sure the witnesses stayed. The trial court assumed the defense would do its job by contacting the defense witnesses and telling them when they needed to appear. The trial court stated that it

31

seemed like defense counsel had been expecting the court to take care of the defense witnesses for counsel.

After recessing and speaking with Ms. Castel-Lovell, the trial court stated that Ms. Castel-Lovell had only been subpoenaed for April 17-19, 2007. Ms. Castel-Lovell did not recall being kept under subpoena when she left the witness stand, but she waited at the court all day Wednesday and Thursday and remained in town all day Friday. Ms. Castel-Lovell reported making her phone numbers available, but everyone acted to her as if she were finished. Ms. Castel-Lovell had specifically mentioned a conversation with defense counsel wherein he wished her a safe trip home. Ms. Castel-Lovell indicated that she was available to be present if defense counsel would fax her a subpoena and make arrangements for her.

The trial court asked the defense its intent. Defense counsel stated it would, if possible, have Ms. Castel-Lovell fly out that evening or in the morning. The trial court denied the defendant's motion for mistrial.

Later in the day, defense counsel said that Ms. Castel-Lovell was not answering her phone. He asked for a subpoena and said that he was going to email her. The trial court agreed that it would have a subpoena faxed to whatever number defense counsel provided. Defense counsel stated that he would attempt to book her a flight out that evening. The trial court said that it needed to know the arrangements before court recessed for the day.

At the end of the day, defense counsel reiterated that he needed to get Ms. Castel-Lovell. Upon inquiry by the court, the defense stated that it had four witnesses, including Ms. Castel-Lovell, who would testify the next day. Defense counsel asked for trial to be recessed until Wednesday, and the trial court denied the request. When

32

defense counsel stated that there was a narrow window of opportunity to obtain the witnesses, the trial court again stated that it was defense counsel's obligation to get his witnesses to trial on time; everyone had been aware of the schedule, the need for the witnesses, and the necessity of keeping the jury busy, and the court was not going to waste the jury's time. Defense counsel responded that he had not told Ms. Castel-Lovell she was free to leave.

The trial court stated that proceedings would commence at nine o'clock the following morning, and defense counsel would be expected to call his witnesses successively. The defense asserted that it was having difficulty contacting Ms. Castel-Lovell because she was not answering her telephone. The trial court responded that it and the prosecutor would contact Ms. Castel-Lovell and make sure everything was arranged in a timely fashion for the morning.

The trial court concluded that defense counsel had not been managing his witnesses:

> [Y]ou knew Ms. Castel had left, you bid her farewell. And then after a whole weekend that -- I don't know what you did over the weekend -- suddenly Monday you decide she needed to be here, and she wasn't here after you told her bye, have a nice trip. I'm not sure you responded correctly to getting your witnesses here on time.
>
> . . . .
>
> THE COURT: Ms. Castel could have been talked to Thursday. She was here all day Thursday. She could have been talked to Wednesday. And she could have been called Friday because she was in town all day Friday. No one bothered to give her the consideration to let her know when she was going to be called to testify. Otherwise, she may have stayed. Now, we're faced with the problem since you didn't do what you were supposed to do that she's in New York.

The defense objected to the trial court's characterization. Defense counsel denied bidding Ms. Castel-Lovell farewell and also denied knowing Ms. Castel-Lovell

33

had not been planning on returning after the weekend. The defense also denied telling Ms. Castel-Lovell she was free from subpoena. Defense counsel urged the trial court to blame the state, since the prosecution had said she was free to leave.

The defense said that it had previously informed the court Ms. Kirby would not be available until Tuesday. Defense counsel said that he had a flight scheduled for Tuesday afternoon, and that he had so informed the court the previous week. The trial court responded that it had then told defense counsel Tuesday would be too late. The trial court stated that defense counsel was expected to have his witnesses present and ready to testify. A lot of people had put their lives on hold, and the matter would be resolved in a timely manner.

On the next morning, Tuesday, April 24, 2007, defense counsel requested a note of evidence to record what had happened with the witnesses. Defense counsel's assistant reported that she and another assistant had continuously attempted to contact Ms. Castel-Lovell regarding the two flights they had scheduled for her, but neither assistant had spoken to Ms. Castel-Lovell or received a response. The assistant further wanted to testify that she had been present when defense counsel had purportedly wished Ms. Castel-Lovell a safe trip. She wanted to clarify that defense counsel had told Ms. Castel-Lovell, "Take it easy now. Have a good evening." The defendant never proffered Ms. Castel-Lovell's testimony into the record.

CONTINUANCE FOR AVAILABILITY OF PATRICIA KIRBY

Insofar as the defendant moved for a continuance because of the unavailability of Ms. Kirby, the state urges that the trial court also did not err in denying relief. The state alleges that, subject to a *Daubert* determination, the trial court was willing to accept the testimony of Ms. Kirby, who was to have arrived in town at 3:00 p.m. on the

34

last day of trial. The state claims that, upon closer inquiry by the trial court, defense counsel admitted to instructing the witness to miss the flight. The state argues that, under these circumstances, the trial court did not abuse its discretion in denying the continuance.

On the morning of April 23, 2007, the defense filed a written "Motion to Recess Trial." The motion sought to recess until the next day based on the following allegations:

> 1.
> Defense Counsel has had difficulty locating key witnesses and having them available any earlier than April 24, 2007. Such witnesses include two experts, and two officers that are critical to the defense.

> 2.
> Despite Counsel's diligent pursuit of these witnesses, Counsel has been unable to secure the witnesses for the trial.

The trial court denied the motion.

At the end of the day on Monday, April 23, 2007, the trial court inquired about the defense's arrangements for Ms. Kirby. Defense counsel answered that she was scheduled to come in the next afternoon. The trial court responded that the stated time was too late. The state interjected that it might be a good time to determine the purpose of Ms. Kirby's testimony; if she was going to be offered as a profiler to discuss the profile that she had provided to the police, the state was objecting.

The defense and the prosecution argued about whether the testimony would be admissible. Defense counsel asserted that she was a fact witness, and the state argued that profiling was not a recognized profession or science. The state continued that Ms. Kirby's testimony should be subject to a *Daubert* hearing, and there was only one Louisiana case allowing a profiler's testimony after a *Prieur* hearing. The state argued that the case was distinguishable because it had been a prosecution for serial offenses

35

and because the profiler's testimony had been used to link the offenses. The state pointed out that the defendant was not being tried for serial offenses, so the testimony could not be offered for that purpose in the instant case. The state further asserted that Ms. Kirby's testimony would be inadmissible if it was offered for the purpose of discovering her opinion of potential suspects, as it would be irrelevant and unduly prejudicial.

The defense urged that Ms. Kirby's testimony should be admissible because a lot of the evidence in the case had been destroyed. Defense counsel stated that he wanted to show the methodology and the mind set of the type of person who would do this sort of crime. The defense wanted to show that the crime was staged. The defendant argued that Ms. Kirby should qualify as an expert in crime scene techniques, profiling, and other disciplines.

The state countered that, if Ms. Kirby was being offered to testify in accordance with her report, the trial court should review the report for relevancy. The prosecutor then asked whether the defense expected Ms. Kirby to provide the opinion documented by the report.

Defense counsel responded that Ms. Kirby would be asked to provide the basis of her analysis in different sections of the report: victimology, medical examiner's report, crime scene assessment, offender profile, and post-offense behavior. The defense then stated that Ms. Kirby would be expected to testify in accordance with the report.

After the state offered a copy of Ms. Kirby's FBI report into evidence and moved to exclude Mrs. Kirby's testimony, the trial court decided that, subject to her passing a *Daubert* examination, Ms. Kirby would be allowed to testify. The trial court

informed the defense that it would be allowed to proffer the evidence into the record if it was excluded.

Defense counsel reiterated that Ms. Kirby's flight would arrive in the afternoon, and the trial court again told defense counsel that it would be too late unless defense counsel had other witness to fill the intervening time. The trial court again instructed defense counsel to make arrangements to get Ms. Kirby to the court in a timely manner and stated that it had already so instructed defense counsel "several times before." The trial court continued that it had corrected defense counsel during the previous week when defense counsel had alluded to calling Mrs. Kirby later in the following week by saying trial was not going to last that long. The trial court said that the trial would have already been over if it had followed the court's usual pattern and proceeded through the weekend.

The trial court ruled that it would not interfere with the defendant calling Ms. Kirby as a witness. However, Ms. Kirby's qualifications and the admissibility of the testimony would be determined after a *Daubert* hearing. The trial court again stressed that Ms. Kirby would have to be presented to the court in a timely fashion. Defense counsel protested that the time constraints were unfair considering the missing and disordered evidence and the short amount of time current defense counsel had to prepare for trial.

The trial court held that any difficulty defense counsel was having in the case had no bearing on when he would call his witnesses. The trial court told defense counsel that he was in control of his witnesses, and defense counsel was the one who had to get his witnesses to the courthouse in a timely and orderly fashion. However, the court would be willing to issue any subpoenas necessary to assist defense counsel

37

in obtaining the presence of his witnesses. Based on defense counsel's conduct with Ms. Castel-Lovell, the trial court explained that it was not sure the defendant's counsel was properly managing his witnesses.

The next morning, Tuesday, April 24, 2007, defense counsel again objected both to the difficulty in getting his witnesses to trial on time and to the lack of evidence available to the defense and informed the court that he intended to rest after calling one more witness. Following examination of his witness, the defense counsel stated that the defense rested unless the court would recess until about three-thirty in the afternoon when the FBI profiler would be present.

After the jury was escorted from the courtroom, the state objected to the defense counsel's representation to the jury that he had a witness scheduled for that afternoon. The state opined that defense counsel had cast unnecessary aspersions on the trial process by so stating. The trial court agreed.

The state and the trial court asked whether the witness was actually en route or whether the flight had been cancelled. The defense attorney responded that the trial court had informed him that it would be too late for the witness to testify if the defense had no intervening witnesses to fill the time. The trial court responded that it had informed defense counsel that he would be required to call witness after witness until the defense rested. The trial court again asked if Ms. Kirby was on a flight, and the defense responded that he had made reservations and paid for the flight with a company credit card.

After the trial court pointed out that defense counsel was avoiding the question, it again inquired whether the witness was on her way to the courthouse. Finally, defense counsel answered the question:

38

MR. JOHN: About 12:30 or 11:30 last night, I asked for a call to be made to tell the professor to not waste her time because she will not make it here in time because the Court will not allow us to delay until 3:00 this afternoon provided we had only one more witness this morning. The Court told us yesterday that there's not going to be any delay for those witnesses because we asked for that before. It would be unfair for the agent to get on the plane, fly to Louisiana, leave the college, she's giving final exams, and appear here, in fact, in Lafayette around three or four o'clock. I asked that yesterday, and I was told, no, that's not going to be granted. We have to move in an orderly fashion.

The trial court agreed with defense counsel, but pointed out that it had told the defense it would be allowed to proffer Ms. Kirby's testimony if she arrived but did not arrive in time to testify at trial. The defense said that it thought the report would be proffered. The state interjected that was incorrect because Ms. Kirby was supposed to be subjected to a *Daubert* examination. The trial court agreed. The defendant never proffered Ms. Kirby's testimony into the record.

ANALYSIS

Under La.Code Crim.P. art. 712, "[a] motion for continuance, if timely filed, may be granted, in the discretion of the court, in any case if there is good ground therefor." "A continuance is the postponement of a scheduled trial or hearing, and shall not be granted after the trial or hearing has commenced. A recess is a temporary adjournment of a trial or hearing that occurs after a trial or hearing has commenced." La.Code Crim.P. art. 708.

Louisiana Code of Criminal Procedure Article 709 sets forth the requirements for a continuance requested based upon the absence of witnesses:

A motion for a continuance based upon the absence of a witness must state:

(1) Facts to which the absent witness is expected to testify, showing the materiality of the testimony and the necessity for the presence of the witness at the trial;

(2) Facts and circumstances showing a probability that the witness will be available at the time to which the trial is deferred; and

(3) Facts showing due diligence used in an effort to procure attendance of the witness.

The trial court repeatedly warned the defense that it was the duty of defense counsel to secure and schedule his witnesses for trial. The record is absent any showing of due diligence in securing the presence of either Dr. Acton or Ms. Kirby. The record also shows a lack of due diligence in securing Ms. Castel-Lovell. The defense did not protest Ms. Castel-Lovell's absence when she informed the defense attorney that she was leaving. The defense made no provisions for Ms. Castel-Lovell's stay in Louisiana following the conclusion of her duties to the state. The defense was aware on Friday that it wanted to call Ms. Castel-Lovell to testify and that she could not be located. Despite the notes of evidence on the record detailing Monday's belated flurry of activity to secure Ms. Castel-Lovell's presence on Tuesday, the record is devoid of any mention that defense counsel attempted to contact her over the weekend. Instead, the defense waited until Monday, the second to last day of trial, to attempt contact.

Further, the record contains neither a statement by the defense setting forth the facts to which Dr. Acton, Ms. Castel-Lovell, and Ms. Kirby would testify nor a proffer of the evidence to which the witnesses would have testified. "In order to show prejudicial error sufficient to warrant reversal, the defendant must show that the testimony the witness would have given would have been favorable to the defense and would indicate the possibility of a different result." *State v. Landry*, 03-1632, p. 11 (La.App. 4 Cir. 5/19/04), 876 So.2d 146, 153, *writ denied*, 04-1586 (La. 11/15/04), 887 So.2d 474 (citing *State v. Stevenson*, 02-79 (La.App. 5 Cir. 4/30/02), 817 So.2d 343).

40

Thus, because there is no evidence in the record that would lead this court to conclude the defendant was prejudiced by the denials of defense counsel's motions for continuance and recesses based on the unavailability of defense witnesses, there was no reversible error.

Accordingly, this assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 3

The defendant claims, "Evidence presented at trial should have been suppressed on the basis that the Defense had no opportunity to examine and test evidence that had been destroyed." The defendant alleges his theory of defense was that someone else was present at the crime scene. The defendant urges that the fingerprint and the DNA test results should be suppressed because much of the evidence in the case had been destroyed: the original window pane bearing the fingerprint, rags, and swabs. The defendant argued that he was denied due process and his constitutional right to confront because he was unable to test this evidence.

The state responds that an extensive list of physical evidence had been destroyed in the case due to the lack of suspects following the dismissal of charges against Mr. Delhomme. The state continues that the destroyed items were not critical because the state had not used them as evidence at trial. However, the oral slides, the cutouts from the pink towel, and the photographs of the crime scene remained. The remaining evidence was made known to the defendant long before trial and the opportunity existed for the defense to have the evidence scientifically tested, but the defense never requested independent examination.

The prosecution urges, moreover, that the defendant never made a showing that independent examination of the spermatozoa would be subject to scientific

41

disagreement. The state maintains that it made all of the data from which the forensic scientist derived their DNA analysis available to the defense. The prosecution asserts that the data was sufficient to allow an independent scientific comparison to be made by the defense.

PRETRIAL OBJECTIONS

On April 11, 2007, the defendant filed a "Motion in Limine to Limit, or Suppress the Use of Evidence at Trial." The defendant sought to suppress the fingerprint and DNA evidence. The defendant complained that the item from which the fingerprint had been lifted had been destroyed. The defendant urged that the contact others had with the evidence may have left behind other fingerprints or DNA, and the defendant was unfairly being singled out and prosecuted for the crime. Defense counsel contended, "It is critical, relevant, and necessary in Mr. Tolliver's defense to retest the source of the fingerprint – a window pane – and DNA – a 'pinkish rag.'" The defendant argued that the DNA and fingerprint should be excluded because the items were unavailable for testing.

The following day, the state filed an opposition to the Motion in Limine. The state responded that the person who found and lifted the fingerprint would be present to testify at trial. The state continued that the chain of custody for the pink towel cutout and DNA extracted therefrom would also be established at trial; plus, all of the physical evidence and witnesses had been made known to the defendant and had been available to him for inspection and testing. The prosecution further asserted that any defects in the chain of custody went to the weight of the evidence and not to the admissibility of the evidence.

In reply, the defendant filed a "Supplemental Motion to View and Inspect" on April 13, 2007. The motion sought the viewing, inspecting, and testing of several items: a) the original LPSO # 3 – containing one pillow case, b) the original LPSO # 3 and FSA # 6, c) the original LPSO # 41 – containing a pink towel, d) the original LPSO #27 – oral and vaginal swabs, and e) the original LPSO # 22 – vaginal swabs.

At the April 16, 2007, hearing, the trial court gave the defense an opportunity to argue its motion to inspect, and the defense asked the court to grant a continuance so it could continue its "scavenger hunt" for evidence by reviewing the disordered and confusing evidence kept by the Sheriff's Office. The state responded by providing the trial court with evidence logs and lists it had previously given to the defense. The state clarified that the state did not have the pillow case, LPSO # 3, because it had been submitted as evidence in Mr. Delhomme's trial and had, subsequently, been destroyed. The prosecutor stated that it had assisted the defense by stopping all unrelated activity whenever defense counsel made a request or inquiry in the defendant's case. The state further said that FSA # 6 was not in its custody or control. However, the state had provided the defense with a letter in December 2006 revealing the existence of the exhibit and the fact it was in the custody of a California laboratory. The state's contact at the laboratory had informed the state that the defense had contacted him the week prior to the hearing about the evidence. The prosecution maintained that FSA # 6 had always been available to the defense.

The state continued that LPSO # 41, which was a towel that had also been introduced into evidence at Mr. Delhomme's trial, had been destroyed. The prosecution stated that LPSO # 27, the original oral and vaginal swabs, were in the custody of the

43

FSA lab. Although the original swabs had been destroyed, the samples taken from the swabs were also available to the defense, and the scientist from the lab would be bringing them to trial with him.

The state said that `it was not familiar with LPSO # 22, and the defendant explained that it was the brown envelope containing the plastic bag holding the vaginal swab. The prosecution asserted that it had provided the defendant with what it had, and it did not have the items requested by the defendant in its possession. The defense disagreed, arguing the scientist in California was going to be used by the state, so the evidence was within the prosecution's control.

The prosecutor further stated that defense counsel had access to a critical piece of evidence, the cutting from the pink towel. The state alleged that the defense had physically viewed the cutting at the Acadiana Crime Lab and had never been denied access thereto. Additionally, the technician who made the cutting was flying in to testify about it. The cutting was no longer in the original envelope.

The defense called the Chief Evidence Custodian, Frank Durand, to testify about the state of the evidence in the case. Lieutenant Durand testified that defense counsel and his staff had visited the evidence room where Lieutenant Durand provided the defense with the documentation he had available. There were some notes made on some of the documentation years after the crime. The notations indicate one item was stored in the safe on February 22, 1988, and two other items were released to the family in 1990. The copy of the document most recently provided to the defense contained the notations. The prosecutor did not have the information contained in the notations, it was only in the possession of Lieutenant Durand.

44

Lieutenant Durand explained that the new investigator on the case had implemented a new numbering system when the case was reopened. Lieutenant Durand had written some of the old numbers next to the new numbers. Lieutenant Durand had done this for all evidence previously numbered; however, he did not make additional notations to evidence that had not been previously numbered. The prosecutor would not automatically know what evidence was available until after he had seen the evidence logs.

On cross-examination, Lieutenant Durand confirmed that he had been available since defense counsel's appointment in December 2006 to provide evidence to the defense. Lieutenant Durand first saw defense counsel a week or two before the hearing. Other than sending a subpoena for trial, defense counsel did not contact Lieutenant Durand in the December, January, February, or March leading up to the hearing. Lieutenant Durand was available to answer questions by defense counsel and display any evidence at defense counsel's request. Lieutenant Durand explained the old and new evidence numbering systems to defense counsel when defense counsel asked about it within the two weeks leading up to the hearing.

The trial court denied the "Supplemental Motion to View and Inspect" on April 16, 2007. The district court found that "defense counsel was given the opportunity to view and inspect any and all items the state had possession of or was in control of."

The trial court next heard the parties' arguments on the Motion in Limine. The defense stated that it had received both testimony and an evidence log showing that certain items of evidence had been destroyed. The defendant complained that it had not been allowed to inspect, copy, examine, test, photograph or otherwise reproduce the destroyed evidence. The defense contended this was a violation of La.Code

Crim.P. art. 718 because the state had once had these items in its possession. Defense counsel moved to prohibit the introduction of any of those destroyed items into evidence.

The state responded that, if the items had been destroyed, they would not be offered into evidence, and the trial court commented that the state would not have been able to produce any evidence that had been destroyed. However, defense counsel may be able to use the destruction of the evidence as exculpatory information.

Defense counsel continued that he also wanted to prohibit the introduction of evidence derived from the destroyed items. The defendant urged that the introduction of the derivative evidence would violate his right to counsel, his right to cross-examine, and his right to due process of law. The defendant sought to prohibit the introduction of the towel cutting and the DNA evidence derived therefrom because the defense could not test the entire towel to discover if there was other DNA evidence present and because the remaining four-millimeter segment of the towel may not be sufficient for testing. The defense additionally urged that the evidence derived from the window pane, the defendant's fingerprint, should be suppressed because the defense could not test the pane to see if there was other evidence present thereon.

When asked by the trial court, defense counsel agreed that he had been provided with photographs of the fingerprints on the window pane. The prosecutor stated that he had allowed defense counsel to look at his entire file, including the exhibits, and the fingerprint had been available to defense counsel at all times.

46

The defendant also stated that he sought to prohibit the introduction of the oral slides and any evidence derived therefrom because the oral swabs had been destroyed. The prosecution replied that the oral slides had been made from the oral samples taken from the victim's mouth, and that the samples had been made for the purpose of delivering it to defense counsel and the defense's expert.

Defense counsel continued that the trial court had, under Mr. Delhomme's docket number, granted the district attorney's office full permission and authority to take any and all evidence being held by the clerk of court. Based on the permission granted to the prosecution, the defense urged that more evidence could have been preserved. Defense counsel asserted that the destruction of evidence prevented the defense from finding another suspect through DNA.

The state rejoined that the defendant's rights were not being compromised by evidence that no longer existed because the state would not be offering destroyed evidence into the record. In response to the trial court's order, the investigator retrieved the packet of cuttings and returned them to Lieutenant Durand's custody. Since DNA analysis did not exist in 1988, the cutting had not been important at the previous trial. The only difference that finding an additional person's DNA would have on the prosecution would be that the defendant would have a co-defendant because the evidence still inculpated the defendant. The state maintained that it would establish a clear chain of custody, which was a question of fact for the jury, and the evidence the state intended to introduce at trial had been available to the defendant.

Additionally, the fruit of the poisonous tree doctrine did not apply, as there had been no showing that the evidence had been seized in an unconstitutional manner.

The defense countered that it was not arguing chain of custody. Instead, it was arguing that the allowance of the derivative evidence would deny the defendant his rights to counsel, to confront, and to due process. The defendant complained that he had been denied equal access to the evidence.

The trial court denied the Motion to Suppress and the Motion in Limine. The trial court found that the state had not denied the defendant due process. The items had been originally made available to the defense. Under the strange circumstances of the case, the state did not act unreasonably in destroying some of the evidence in the case where there had been a reasonable belief that it was no longer necessary. Only fortuitous circumstances allowed some of the evidence to be preserved, and those items preserved were made available to the defense.

OBJECTIONS AT TRIAL

At trial, the defense objected to the introduction of the fingerprint into evidence because the defendant had not had an opportunity to examine the window pane from which it was lifted. The state replied that it had established a chain of custody for the fingerprint, so it was a chain of custody issue and not one regarding admissibility. The trial court overruled the defense's objection. The defendant again asserted that he had been denied his right to confront and cross-examine by not being given the opportunity to independently examine the window pane. The defense moved for a mistrial. The

trial court overruled the objection and denied the mistrial upon finding the witness had identified the print and the state had established the chain of custody for the fingerprint.

The defendant raised the same objection later when Detective Bayard was speaking about obtaining a fingerprint match from AFIS: the evidence should not be admitted because the defense had been unable to examine the window pane whence the fingerprint was lifted. Thus, defense counsel argued, the defendant had been denied his right to confront. Once again, the trial court overruled the objection and denied a mistrial.

The defendant later raised the same objection when the state introduced a photograph of the evidence packet retrieved by the district attorney from the clerk of court's office. The defense objected to the derivative evidence, the towel cutting, contained therein. The trial court overruled the objection.

ANALYSIS

Under La.Code Crim.P. art. 718, the state is required to allow the defense to inspect evidence that is in the state's possession, custody, or control:

> Subject to the limitation of Article 723, on motion of the defendant, the court shall order the district attorney to permit or authorize the defendant to inspect, copy, examine, test scientifically, photograph, or otherwise reproduce books, papers, documents, photographs, tangible objects, buildings, places, or copies or portions thereof, which are within the possession, custody, or control of these, and which:
>
> (1) are favorable to the defendant and which are material and relevant to the issue of guilt or punishment, or
>
> (2) are intended for use by the state as evidence at the trial, or
>
> (3) were obtained from or belong to the defendant.

49

The court may determine whether evidence is subject to the provisions of Paragraph (1) hereof by in camera inspection.

"A criminal defendant has the constitutional right to present a defense. A defendant should therefore be allowed to present evidence on any *relevant* matter. This right is not without limitation, and unreliable evidence may be barred from criminal trials." *State v. Blank*, 04-204, p. 49 (La. 4/11/07), 955 So.2d 90, 130-131, *cert. denied*, 128 U.S. 494, 128 S.Ct. 494 (2007) (citing U.S. Const. amends. VI and XIV; La.Const. art. I, § 16)(citations omitted)(emphasis added).

The defendant does not deny that all the evidence introduced at trial was available for independent examination and testing. The defendant also does not claim that the state refused to provide the defendant access to any of the evidence it had in its possession, custody, or control during the relevant time frame, which was from when law enforcement identified the defendant as a possible suspect until the jury rendered its verdict.

Instead, the defendant contends that three items of evidence not introduced at trial were unavailable for independent examination and testing. The items were unavailable because they had been destroyed at some point in the twenty years between the crime and the trial. The state no longer had possession, custody, or control of those items, and the defendant did not seek to examine those items until four days before trial, which was the day after the defendant filed his Motion in Limine. The defendant had an opportunity, both before and during trial, to question the individuals responsible for collecting and testing the evidence before its destruction.

50

Thus, there has been no violation of La.Code Crim.P. art. 718, of the defendant's right to due process, or of his right to confront and cross-examine the witnesses who testified against him.

Moreover, the defendant's stated purpose for raising this claim was that careful examination of the destroyed evidence may have implicated an additional person in Mrs. Theriot's murder. Assuming *arguendo* that full access to the destroyed evidence would have shown an additional person participated in the offense, the evidence presented at trial still clearly proved beyond a reasonable doubt that the defendant was a principal in Mrs. Theriot's murder. The defendant was a person present at the crime, and he was concerned in the commission of the crime either as the person who directly committed the homicide or as a person who aided and abetted in the commission of the murder. La.R.S. 14:24. "It is not necessary for the prosecutor to prove the guilt of both principals in order to convict one." *State v. Irvine*, 535 So.2d 365, 368 (La.1988). Therefore, the defendant was not denied his right to present a defense because the implication of an additional person would not have exonerated the defendant and because the state was not required to prove the guilt of a second person in order to prove the defendant's guilt.

Accordingly, this assignment of error is without merit.

**CONCLUSION**

The defendant's conviction is affirmed.

**AFFIRMED.**